Marvin Belt and Jacqueline Belt v. Commissioner.
Belt v. Commissioner
Docket No. 2330-67.
United States Tax Court
T.C. Memo 1971-253; 1971 Tax Ct. Memo LEXIS 81; 30 T.C.M. (CCH) 1094; T.C.M. (RIA) 71253; September 29, 1971, Filed George A. Jones, for the petitioners. Ralph F. Keister, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined a deficiency in petitioners' income tax for 1963 in the amount of $928.86. The issues for decision are as follows: (1) Whether Marvin Belt made cash payments in the amount of $31,950 to one of his customers during 1963 and thereby reduced his gross receipts from that customer *82 in that amount; and (2) Whether respondent correctly determined the deduction for depreciation allowable for an automobile purchased by Marvin Belt in November 1963. Findings of Fact Marvin Belt (hereinafter referred to as petitioner) and Jacqueline Belt, husband and wife, were legal residents of Allen Park, Michigan, at the time their petition was filed. They filed a joint Federal income tax return for 1963 with the district director of internal revenue, Detroit, Michigan. During 1963, and for a number of years prior and subsequent thereto, petitioner engaged in the truck leasing business as a sole proprietor under the name of Marvin Belt Company. In this business, he leased tractors and semi-trailers to customers in the Detroit, Michigan, area. Among his customers were several beer, wine, and liquor distributors. Beginning in December 1960, petitioner began leasing tractors and semi-trailers to City Beverage Co., Inc. (hereinafter City Beverage), a beer distributor located in Pontiac, Michigan. City Beverage leased petitioner's equipment for the purpose of transporting Pabst and Blatz beer from the brewery in Milwaukee, Wisconsin, to its place of business in Pontiac, and *83 returning the empty containers to the brewery in Milwaukee. For several years, City Beverage used the services of common carriers, including Wolverine Trucking Company (hereinafter Wolverine), for transporting its beer. During the 2-year period in which City Beverage used Wolverine's services - from May 1959 until May 1961 - City Beverage paid a rate of 25 cents per case for the transportation of beer and return of empty cases between Pontiac and Milwaukee. Rates charged by common carriers were regulated by the Interstate Commerce Commission (hereinafter ICC) and the cost of their services was ordinarily greater than the rental on leased equipment. When City Beverage used Wolverine's services, however, it did not incur any responsibilities for paying the drivers or carrying cargo or liability insurance. During the period in which City Beverage used Wolverine's trucks, friction developed between the former and ICC and Michigan Public Service Commission inspectors. This friction, along with the fact that leasing petitioner's trucks was cheaper, were the main reasons for City Beverage's decisions in 1960 and 1961 to lease petitioner's 1095 equipment rather than continue its arrangement *84 with Wolverine. On December 19, 1960, petitioner and City Beverage signed a lease agreement covering one tractor and semi-trailer for a a 1-year period ending December 18, 1961. This lease provided for a rental charge of 21 cents per mile for the use of the tractor and semi-trailer unit. On May 13, 1961, however, petitioner and City Beverage entered into a new lease agreement covering the same tractor and semi-trailer and providing for a lease charge of 25 cents per mile. The rate of 25 cents per mile was approximately equal to a charge of 25 cents per case, based upon a customary load of 1,134 cases, when all additional costs absorbed by a lessee are taken into account. The two parties also entered into 5 additional lease agreements covering other tractors and semi-trailers on May 13, 1961, and providing for a rate of 25 cents per mile. The new leases covered a 1-year period running from the date of execution until May 12, 1962. Thereafter, from June 1961 until the latter part of 1964, when City Beverage ceased leasing trucks from petitioner, the two parties executed numerous leases for petitioner's equipment specifying a rate of 25 cents per mile for each tractor and semi-trailer *85 unit. All these lease agreements contained substantially similar terms, differing mainly in the descriptions of equipment, periods covered, and the dates of execution. When City Beverage leased trucks from petitioner, it incurred responsibility for paying the drivers (including employment taxes, workmen's compensation insurance, etc.), and for providing the necessary liability and cargo insurance. During 1963, drivers of the equipment leased by City Beverage from petitioner were paid gross wages of $72.50 per round trip between Milwaukee and Pontiac, Michigan. Although the lease agreements executed on May 13, 1961, and subsequent thereto, provided for a rate of 25 cents per mile, petitioner and Harold A. Cousins (hereinafter Cousins), one of the partners of City Beverage, agreed that the actual rate for leasing the equipment would be the equivalent of 21 cents per mile. The difference between the lease rate of 25 cents and the agreed upon rate of 21 cents would be paid in cash by petitioner to City Beverage at the time the former submitted invoices for payment. City Beverage sent petitioner a monthly schedule of orders to be picked up at the brewery in Milwaukee. Approximately *86 once a week, petitioner would determine the number of loads picked up and delivered, figure the lease charge for the use of his trucks on the equivalent of 25 cents per mile, and prepare an invoice for this lease charge. He would then compute the difference between the lease charge and the agreed upon charge of the equivalent of 21 cents per mile and would send this difference in cash to City Beverage along with the invoice based upon the lease charge. City Beverage, upon receipt of the invoice, would pay it in full. As a result of the cash payment by petitioner he actually received less net rentals for his trucks than were evidenced by his invoices and the checks received from City Beverage. During 1963, he had gross receipts from leasing trucks to City Beverage of $194,948 rather than $226,898 evidenced by the invoices. The difference represented the cash payments made by petitioner to City Beverage. The ICC approved tariffs prescribing a uniform rate for common carriers hauling between Milwaukee and Pontiac, Michigan. While the ICC had no direct control over the rates charged by lessors such as petitioner, it had responsibility for enforcing safety regulations. City Beverage signed *87 the leasing contracts with petitioner in May 1961 specifying a rate of 25 cents per mile, because Cousins believed this would avoid further friction with the ICC and Michigan Public Service Commission inspectors. During the years 1960 through 1964, petitioner also leased tractors and semi-trailers to other beer, wine, and liquor distributors for the purpose of transporting products from the manufacturers to these dealers. The following table sets forth various leases entered into by petitioner, showing the date of each lease, the name of the lessee distributor, and the lease charge for petitioner's equipment: Date
Lessee
Lease Charge
May 2, 1960
Century Importers, Inc.
21 cents/mile
Dec. 19, 1960
West Side Beverage, Inc.
21 cents/mile
May 1, 1961
Century Importers, Inc.
21 cents/mile
Mar. 13, 1963
L & L Wine & Liquor Corp
21 cents/mile
Mar. 27, 1963
Foran Beverage
21 cents/mile 1096 In his 1963 joint income tax return, petitione 1096 In his 1963 joint income tax return, petitioner reported gross receipts of $276,206.88 of which $226,898 represented gross receipts from City Beverage. He also deducted depreciation of $2,133.33 for the *88 newly purchased 1964 Lincoln Continental (acquired on November 15, 1963, at a cost of $6,400). In his notice of deficiency issued February 17, 1967, respondent determined that petitioner had deducted excessive depreciation, and allowed depreciation of $520.89 based upon a useful life of 4 years (double declining balance method) from November 1, 1963. On May 15, 1967, the petition herein was filed. On April 18, 1967, petitioner filed an "amended" joint Federal income tax return for 1963 with the district director of internal revenue, Detroit, Michigan. The amended return reflected gross receipts of $244,256.88, of which $194,948 represented gross receipts from City Beverage. An amended petition herein was filed on July 8, 1968. Ultimate Findings of Fact (1) Petitioner made cash payments in the amount of $31,950 to City Beverage during 1963 with the result that his gross receipts for 1963 from leasing equipment to City Beverage were $194,948 as reported in his "amended" joint Federal income tax return for that year. (2) Deduction for depreciation on a 1964 Lincoln Continental was properly determined by respondent in his notice of deficiency. Opinion The principal issue *89 is whether petitioner made cash payments to City Beverage during 1963 in the amount of $31,950. Petitioner contends that he did, with the result that his receipts from his truck leasing business have been overstated by that amount. He asserts that, although all his written contracts with City Beverage executed after May 13, 1961, called for him to be paid at the rate of 25 cents per mile, he was in fact paid at a net rate of only approximately 21 cents per mile, and the difference of 4 cents was refunded, rebated, or repaid to City Beverage. Respondent denies that any refunds, rebates, or repayments of any kind were made and urgently insists that petitioner realized gross truck rental income to the full extent of 25 cents per mile. Petitioner has shown that, on December 19, 1960, he and City Beverage executed an agreement calling for a leasing charge of 21 cents per mile for a 1-year period. Less than 6 months later, petitioner testified, Cousins told him that he had been experiencing difficulties with an ICC inspector and with a representative of the Michigan Public Service Commission, and that he was concerned that his troubles would persist if he leased trucks at rates which *90 were lower than common carrier rates. Petitioner testified that he and Cousins worked out an arrangement whereby City Beverage would sign contracts calling for payments of 25 cents per mile (roughly the equivalent of the common carrier rate) and would pay that amount but petitioner would refund or rebate the difference of 4 cents per mile. Cousins vehemently denies that any such refunds or rebates were made and insists that City Beverage paid the full 25 cents per mile rental charge. Petitioner argues that an examination of the precise wording of Cousins' testimony shows that Cousins did not deny that City Beverage (as distinguished from Cousins personally) received cash payments from him. However, we think the testimony of petitioner and that of Cousins are contradictory. We are required to resolve the conflict on the basis of the record before us. While the record is not wholly satisfactory, we have concluded that the preponderance of the evidence presented to us supports petitioner's contention. To support his position, respondent cites Cousins' testimony, petitioner's invoices of charges computed by using the 25-cent rate, the payments of those invoices by City Beverage, and *91 the absence of business documents substantiating petitioner's alleged cash payments or refunds. Respondent also points out that petitioner's 1963 income tax return did not reflect the payments, and an amended return containing computations indicating that the payments were made was not filed until after this proceeding was instituted. Petitioner testified that, along with the invoices computed on the basis of a charge of 25 cents per mile, he sent cash to City Beverage in amounts equivalent to 4 cents per mile. He introduced worksheets which he testified were prepared for each invoice reflecting the computations of the cash payments; these computations reflected "refunds" computed on a per case rather than a per mile basis, and the "refunds" approximate 4 cents per mile. While we recognize that the evidentiary weight of these papers 1097 can be no greater than petitioner's own credibility, they provide some confirmation of his testimony. He also introduced the testimony of a bank teller who confirmed that during the period in controversy and until the latter part of 1964, when the repayments to City Beverage ceased, petitioner frequently withdrew substantial amounts of cash in *92 bills of large denominations. Petitioner Jacqueline Belt testified that she frequently visited the bank, obtained the necessary cash, and mailed it to City Beverage along with the invoices. Further support for petitioner's position lies in the fact that the 25-cent per mile rental rate called for in May 1961 does not appear to be much, if any, less expensive than the common carrier rates, whereas Cousins testified that City Beverage terminated its relationship with Wolverine in order to reduce costs. Prior to entering into these leases, City Beverage had been served by Wolverine, which charged a common carrier rate of 25 cents per case. Under the May 1961 lease agreements, City Beverage agreed to pay petitioner 25 cents per mile, which the testimony indicates was equivalent to 24 cents per case (after adjustments for tolls and the driver's salary), [1] and City Beverage became responsible for paying other expenses not incurred when served by common carriers. These additional expenses include such items as cargo insurance, possible fines and penalties, costs incidental to the drivers' salary such as employment taxes, workmen's compensation, health insurance, and the like. Although *93 the amounts of these expenses were not shown precisely, it appears that they offset most, if not all, of the difference between the common carrier and the 25 cents per mile rates. In light of this evidence, we are not convinced that the 25-cent per mile rate was, in fact, less expensive for City Beverage than the common carrier rate. Also, petitioner and City Beverage entered into a 1-year lease at the 21-cent per mile rate covering one tractor and semi-trailer unit in December 1960; yet this lease was replaced by one calling for 25 cents per mile less than 6 months later, in May 1961. When *94 asked about this substantial increase, Cousins was unable to give any satisfactory explanation except to say petitioner's costs had increased. Why City Beverage would forego its contract right to service at the lower rate for the full year is unexplained. Cousins admitted that he had trouble with at least one ICC inspector and that he, Cousins, had refused to allow the inspector on the premises of City Beverage withou a court order. He further admitted that his trouble with this inspector was one reason for City Beverage's shift from using common carriers to leasing petitioner's trucks, and he was evasive when pressed for reasons other than the alleged disparity in costs, discussed above. This proven friction between the ICC and City Beverage provides some corroboration for petitioner's testimony. Petitioner also introduced several other contracts entered into by him and other beer distributors covering the period from 1960 to 1963 and later periods, and all of them specified a rate of 21 cents per mile. These contracts are in substantially the same form as the City Beverage contracts, except for the rate provision. The 21-cent per mile rate appears clearly to have been petitioner's *95 customary rate. Other witnesses, who were engaged in the trucking business or were otherwise familiar with leasing rates, testified generally that other truck lessors' charges were within the range of 21 cents per mile or even less. Respondent's only answer to this evidence is that each such contract is separately negotiated. This is true, but it is not a satisfactory answer. It does not explain why City Beverage, which used most of petitioner's equipment, was charged a higher rate than other lessees. Respondent has noted that petitioner's original joint income tax return for 1963 did not reflect the cash payments to City Beverage; that petitioner did not amend his return to correct this omission until 1967; and that this issue was not raised in the present proceeding until July 1968, when petitioner filed an amended petition. Petitioner answers this argument by pointing to evidence that his business records were disorganized and unsystematic, and that he did not discover the error until shortly before the corrections were made. He maintained no journals or ledgers; his records consisted mainly of his check stubs, 1098 invoice copies, and similar papers. One of petitioner's former *96 secretaries testified that, when she started working for him, his records were in very poor condition; for example, she found cash in old envelopes and uncashed checks over one year old in amounts as much as $450 among piles of papers in his offices. Two of these stale checks which failed to clear the bank when presented for payment were introduced in evidence to corroborate this testimony. Furthermore, petitioner's original 1963 tax return was prepared by his secretary who had no professional experience preparing tax returns, and she did not go into this matter. We think petitioner's delays in examining the data underlying the figures in his return and amending his petition are consistent with the manner in which he did the other paperwork connected with his business. Furthermore, the testimony indicates that the records which he kept were in such condition that the errors in his returns would not likely be discovered until he was stimulated to a re-examination of them by the Internal Revenue Service audit. As to the depreciation issue, in his tax return for 1963, petitioner claimed a deduction for depreciation of an automobile acquired on November 15 of that year in the amount *97 of $2,133.33, which was one-third of the cost. Respondent allowed a deduction for depreciation in the amount of $520.89, computed under the double declining balance method on the basis of a useful life of 4 years. Petitioner here claims that depreciation should be computed on the basis of a 6-year useful life with an additional allowance for first year depreciation under section 179, Internal Revenue Code of 1954, depreciation for the two months (November 1 to December 31) in 1963, an investment credit, and a separate deduction for the cost of tires, license, and title. There is no ground on which petitioner's position on this issue can be sustained. Section 179(a) provides that in the case of "section 179 property," the term "reasonable allowance" for depreciation includes an allowance, for the first taxable year for which a deduction is allowable, of 20 percent of the cost of such property. Section 179(d) defines "section 179 property," and one of the requirements is that it be tangible personal property "with a useful life (determined at the time of such acquisition) of 6 years or more." The only evidence of any kind on this issue is a single paragraph in *98 the supplemental stipulation reciting that petitioner "purchased a 1964 Licoln automobile on November 15, 1963, at a price of $6,400.00." Thus, petitioner has failed to prove that his new automobile had a useful life of 6 years. Nor is there any evidence as to the cost of the tires, license, and title. On this issue, respondent's position is sustained. Decision will be entered under Rule 50. Footnotes
1. The testimony is that 1,134 cases comprised a load; at 24 cents per case, the cost of a round trip load was $272.16. The round trip from Pontiac to Milwaukee was 774 highway miles; at the rate of 25 cents per mile, the cost of the round trip was $193.50 plus $72.50 for the driver plus $6 for tolls, a total of $272. These latter figures, computed on a mileage basis, do not take into account other costs borne by common carriers which a lessee was required to absorb, such as the cost of cargo and liability insurance, social security taxes on the drivers' pay, workmen's compensation, etc.↩